**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
UNITED STATES OF AMERICA,

       Plaintiff,

       -against-

JAMES J. RICH, JR., also known as "Chip,"

       Defendant.

---------------------------------------------------------X

**DECISION AND ORDER**
12-cr-424 (ADS)

**APPEARANCES:**

**United States Attorney for the Eastern District of New York**
*Attorneys for the Plaintiff*
271 Cadman Plaza East
Brooklyn, NY 11201
    By: Assistant United States Attorney, Saritha Komatireddy

**LaRusso & Conway LLP**
*Attorneys for the Defendant*
300 Old Country Rd
Suite 341
Mineola, NY 11501
    By: Robert P. LaRusso, Esq., Of Counsel

**SPATT, District Judge**

    Presently pending before the Court is a motion by the Defendant James J. Rich, Jr., also known as "Chip" (the "Defendant"), for the withdrawal of his guilty plea to Count One of the Superseding Indictment and to dismiss Counts One through Three of that Indictment.

### I. BACKGROUND

    The following facts are generally undisputed and, in any event, in this decision, the Court makes no findings of fact.

In early 2012, a confidential informant advised the Federal Bureau of Investigation ("FBI") that the Defendant had sold crack cocaine to him on several occasions. The FBI then conducted controlled purchases of crack cocaine by the confidential informant from the Defendant and recorded those purchases with audio and video recording equipment. The controlled purchases, each involving less than one gram for $100, occurred on March 26, 2012 in Central Islip, New York and on April 3, 2012 at the Defendant's residence in Wyandanch, New York. These drug sales carried a punishment of from zero to twenty years incarceration, enhanced to zero to thirty years due to the Defendant's prior drug conviction, a fact known to law enforcement.

On April 4, 2012, the FBI obtained and executed a search warrant on the Defendant's residence and recovered, among other things, crack cocaine, marijuana, digital scales, and small plastic bags. During the execution of the search warrant, FBI Special Agent Gregory C. Kies interviewed the Defendant. Special Agent Kies advised the Defendant of his Miranda rights. The Defendant spoke with Special Agent Kies and admitted that he had sold drugs since he was a little child and sold crack cocaine for the previous four months. The Defendant further admitted that, on a daily basis, he purchased one gram of crack cocaine for fifty dollars from an individual in Amityville, New York and sold that crack cocaine to his customers for one hundred dollars per gram. The Defendant also admitted that he had been associated with a gang called "K-T," or "Killa Thugs" in the past. In addition, the Defendant signed a written consent to search form authorizing the FBI to search his three mobile phones.

A review of the Defendant's criminal history revealed that the Defendant had a prior conviction for robbery at the age of seventeen and numerous prior convictions for drug offenses.

In particular, on May 19, 2000, the Defendant plead guilty to Robbery in the Third Degree in New York State court in connection with an act of robbery that involved the display of a firearm.

At this point, the parties' version of events diverge to a degree. Accordingly, the Court delineates their respective versions.

A. <u>The Government's Account of the Reverse Sting Operation</u>

As the Government concedes, it subsequently orchestrated a "reverse sting" drug operation aimed at the Defendant.

Of relevance here, the Government contends as follows:

The Defendant discussed participating in a robbery and recruiting at least one other individual to participate in the robbery. The Government also contends that the Defendant expressed his intention to possess a firearm during the robbery and ensure that the other individual possessed a firearm as well. The Defendant further discussed his intention to bring duct tape and zip ties to the robbery site to restrain the intended victims. The Defendant and the confidential informant also discussed how they would divide the narcotics and cash obtained during the robbery. The FBI recorded the conversation with audio and video recording equipment.

On May 27, 2012, the confidential informant contacted the Defendant by sending a text message to the Defendant's mobile phone. The confidential informant inquired whether the Defendant was still "in" for the robbery later that week. The Defendant responded, "Hell yea, u gotta give me the address so I can scope the place out."

On May 30, 2012, the Defendant contacted the confidential informant and reported that he had secured participation in the robbery of an additional individual, a co-conspirator, and that the co-conspirator desired to meet the confidential informant. Later that day, the Defendant, the

3

co-conspirator, and the confidential informant meet near the Tanger Outlets in Deer Park, New York, and discussed the planned robbery. All three discussed the logistics of carrying out the robbery, which contemplated the Defendant and the co-conspirator forcibly entering the narcotics trafficker's residence after the confidential informant transported them to the location. The three men also discussed how they would divide up the narcotics and cash obtained during the robbery and agreed that the robbery would be conducted the following day. The FBI surveilled and recorded this meeting with audio and video recording equipment.

B. The Defendant's Account of the Reverse Sting Operation

Of relevance here, the Defendant frames the reverse sting operation as follows:

The FBI sought to enhance the pressure on the Defendant to participate in the home invasion robbery by having the confidential informant tell him that the narcotics traffickers were "white boys" with a substantial amount of drugs and money, approximately $30,000.

The Defendant notes that the FBI directed the confidential informant to instruct the Defendant to bring handguns, and, in one of the recordings, is heard instructing the Defendant "you have to bring burners," a reference to weapons. Relatedly, the Defendant contends that the FBI instructed the confidential informant to bring another person to assist in the home invasion.

C. The Defendant's Arrest

Throughout the day of May 31, 2012, the Defendant and the confidential informant engaged in a series of consensually recorded telephone conversations during which the two discussed, in sum and substance, when and where the robbery participants would meet to conduct the crime. At approximately 7:45 p.m., the Defendant, the co-conspirator, and the confidential informant met in the parking lot of an office building in Commack, New York, which was to serve as a staging point prior to committing the robbery. After a brief discussion

4

between the three men and after the vehicle carrying the Defendant and the co-conspirator began to depart the area, law enforcement officers arrested the Defendant and the co-conspirator.

At the time of the arrest, the Defendant was wearing a black long-sleeved thermal shirt, black leggings, black shorts over those leggings, and dark-colored sneakers. In plain view on the floor of the vehicle carrying the Defendant and the co-conspirator were a roll of gray duct tape and an assortment of latex gloves.

D. <u>The Arraignment, the Indictments, and the Present Motion</u>

On June 1, 2012, the Defendant was arraigned on a complaint charging him with Hobbs Act conspiracy, 18 U.S.C. § 1951(a).

On June 28, 2012, a grand jury returned an indictment against the Defendant on charges of Hobbs Act conspiracy (Count One); conspiracy to distribute heroin and cocaine (Count Two)(21 U.S.C. § 846); and attempted possession of heroin and cocaine with intent to distribute (Count Three)(21 U.S.C. § 846). The co-conspirator plead guilty to one count of conspiracy to commit a Hobbs Act robbery, but the Defendant expressed his intention to exercise his right to a trial by jury.

On August 29, 2013, a grand jury returned a Superseding Indictment against the Defendant containing the aforementioned charges and adding charges of distribution of cocaine bases (Counts Four and Five)(21 U.S.C. § 841(a)(1)).

On September 6, 2013, the Defendant plead guilty before United States Magistrate Judge A. Kathleen Tomlinson to Count One of the Superseding Indictment. Placing the Defendant under oath and engaging him in a colloquy, Judge Tomlinson ensured that the Defendant was competent to plead guilty and understood the plea proceedings. The Defendant acknowledged his participation in the reverse sting operation and accepted responsibility for his conduct. The

Defendant also entered into a plea agreement.  The plea agreement and the presentence report calculated the guidelines by applying the career offender guideline section 4B1.1, and determined the adjusted offense level to be a level 29 with a prison range of 151 to 188 months.

On September 10, 2013, this Court accepted the Defendant's guilty plea.

On December 3, 2014, relying on United States v. Hudson, 3 F. Supp. 3d 772 (C.D. Cal. 2014), the Defendant moved for a withdrawal of his plea to Count One of the Superseding Indictment and to dismiss Counts One through Three of that Indictment.  In Hudson, the District Court dismissed an indictment against a defendant on the ground that the reverse sting operation engineered by the Government constituted "Outrageous Government Conduct" that transcended the bounds of Due Process required by the Fifth Amendment to the United States Constitution.  Similarly, here, the Defendant contends that the Government's "outrageous conduct" in persuading him to commit the criminal offenses outlined in Counts One through Three of the Superseding Indictment amounted to a violation of his rights under the Fifth Amendment Due Process Clause.

Of relevant note, on December 4, 2014 – one day after the Defendant filed his motion – the United States Ninth Circuit Court of Appeals reversed the District Court decision in Hudson. United States v. Dunlap, Nos. 14-50285, 2014 WL 6807733 (9th Cir. Dec. 4, 2014).  In pertinent part, the Ninth Circuit, while "question[ing] the wisdom of the government's expanding use of fake stash house sting operations," found that the sting operations conducted in that case did not "cross the line into outrageous government conduct" and, therefore, did not violate the Defendant's due process rights. Id. at *1.

This is but the latest in a series of challenges filed by defendants indicted in this Circuit on drug-related charges involving reverse sting operations. See e.g., United States v. Viera, No.

6

14 CR 83 (ER), 2015 WL 171848 (S.D.N.Y. Jan. 14, 2015); United States v. Gomez, No. 14 Cr. 459 (SAS)(S.D.N.Y. Dec. 2, 2014); United States v. Davis, ⎯⎯ F.3d ⎯⎯, No.13 Cr. 986 (LTS), 2014 WL 5758199, at *1 (S.D.N.Y. Nov. 5, 2014); United States v. Borrero, No. 13 Cr. 58 (KBF), 2014 WL 5493241, at *1 (S.D.N.Y. Oct. 30, 2014).

Here, the Government maintains that the motion to dismiss is procedurally barred because by entering into an unconditional plea of guilty, the Defendant waived any right to move for dismissal of the relevant charges against him. Further, the Government argues that even if the Defendant's motion was not procedurally barred, it fails on the merits because the Government's conduct in this case did not rise to the demanding level of "outrageous" so as to warrant dismissal of the charges on due process grounds.

In his reply brief, the Defendant gives short shrift to the procedural hurdles that typically face an application to withdraw a guilty plea. The Defendant generally asserts that his prior counsel's ineffective representation in failing to previously raise the "outrageous government conduct" issue overcomes any argument that the Defendant's motion is procedurally barred.

## II. DISCUSSION

Under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, a defendant may withdraw his or her guilty plea before the district court imposes sentence if "the defendant can show a fair and just reason for requesting the withdrawal."

As such, the defendant bears the burden of demonstrating valid grounds for the withdrawal of a guilty plea. United States v. Doe, 537 F.3d 204, 210–11 (2d Cir. 2008). That burden has been described by the Second Circuit as "stringent." United States v. Schmidt, 373 F.3d 100, 102 (2d Cir. 2004). In assessing whether the defendant has met that high burden, a district court should consider (1) whether the defendant has asserted innocence as the basis for

7

the motion, (2) the lapse of time between the plea and the withdrawal motion, and (3) prejudice to the government by withdrawal of the plea. Id. at 102–03.

A change of heart does not suffice – a defendant may not "withdraw his guilty plea simply on a lark" and must not be permitted to "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." United States v. Hyde, 520 U.S. 670, 676–77, 117 S. Ct. 1630, 137 L. Ed. 2d 935 (1997). A guilty plea is a "grave and solemn act," not to be entered into or withdrawn lightly. Id. at 677 (internal quotation marks omitted). "Society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." United States v. Maker, 108 F.3d 1513, 1529 (2d Cir. 1997)(citations and internal quotation marks omitted).

Because the defendant bears the demanding burden of demonstrating that valid grounds for withdrawal exist, "[t]he Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal; however, the presence or absence of such prejudice may be considered by the district court in exercising its discretion." United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992). Indeed, "[t]he decision to allow a guilty plea to be withdrawn is committed to the district court's discretion." United States v. Pichardo, No. 14-258-CR, 2014 WL 6980460, at *1 (2d Cir. Dec. 11, 2014).

Here, the Defendant argues there was ineffective assistance of counsel in connection with his former counsel's failure to file an "outrageous government conduct" motion. This argument speaks to the voluntariness of his guilty plea.

8

Indeed, "[i]neffective assistance of counsel may render a guilty plea involuntary, and hence invalid." Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir. 1992). Under Strickland v. Washington, 466 U .S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to establish ineffective assistance of counsel, the Defendant must show that "counsel's representation fell below an objective standard of reasonableness," id. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In assessing a counsel's performance, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990)(internal quotation marks omitted).

Here, the Government argues that the Defendant fails to satisfy the first prong of an ineffective assistance of counsel claim – namely, that his prior counsel's performance was objectively unreasonable. In particular, the Government asserts that any failure of the Defendant's prior counsel to raise the "outrageous government conduct" issue was "objectively reasonable" because such a motion would have lacked merit.

The Court recognizes that "[t]he decision not to pursue a meritless motion does not constitute ineffective assistance of counsel." Ocampo v. United States, No. 99-CV-6727 (JG), 2004 WL 611959, at *11 (E.D.N.Y. Mar. 22, 2004); Knutson v. United States, No. 00 CV. 4830 (ILG), 2002 WL 31946878, at *5 (E.D.N.Y. Nov. 26, 2002)("Since Knutson had no viable claim of outrageous police conduct, it follows that it cannot have been ineffective assistance of counsel for his attorney not to have raised the defense."). The question then becomes whether a motion by the Defendant's prior counsel to dismiss certain charges of the Superseding Indictment based on the alleged "outrageous government conduct" would have been meritorious or futile?

9

The Fifth Amendment to the Constitution of the United States provides, in pertinent part, that: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In Hampton v. United States, 425 U.S. 484, 493–94, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976), the Supreme Court of the United States recognized the possibility that government involvement in a crime might become so "outrageous" that it violates the Fifth Amendment Due Process rights of a defendant. See also United States v. Al Kassar, 660 F.3d 108, 121 (2d Cir. 2011)("Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped."). To establish a violation of due process on this basis, a defendant must show government conduct so outrageous that "common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction." Al Kassar, 660 F.3d at 121 (quoting United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997)); see also United States v. Bout, 731 F.3d 233, 238 (2d Cir. 2013)(same). "Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." Al Kassar, 660 F.3d at 121 (citing Schmidt, 105 F.3d at 91); United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999)("The paradigm examples of conscience-shocking conduct are egregious invasions of individual rights.").

In this context, a defendant's burden is a heavy one because courts are required to be deferential to the Government's "choice of investigatory methods." See Rahman, 189 F.3d at 131 (internal citation omitted). "It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." Al Kassar, 660 F.3d at 121 (internal

citations omitted). Therefore, even a sting operation that involves "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits." United States v. Cromitie, 727 F.3d 194, 219 (2d Cir. 2013), cert. denied, ––– U.S. –––, 135 S. Ct. 53, ––– L. Ed. 2d ––– (2014).

"What amounts to outrageous government conduct in the investigatory context defies precise verbal formulation." United States v. Colon, No. 3:14-CR-00085 (JAM), 2014 WL 6390566, at *5 (D. Conn. Nov. 17, 2014). "The Second Circuit has defined it through examples of what it is and what it is not." Id. On the one hand, "'[g]enerally, to be 'outrageous' the government's involvement in a crime must involve either coercion or a violation of the defendant's person.'" Bout, 731 F.3d at 238 (quoting Al Kassar, 660 F.3d at 121). As Judge Friendly once suggested, "there is certainly a limit to allowing governmental involvement in crime," and "[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." United States v. Archer, 486 F.2d 670, 676–77 (2d Cir. 1973)(footnote omitted). "[T]hat said, the government's use of manipulative, sneaky, and deceitful investigative methods does not, without more, rise to the level of a constitutional outrage." Colon, 2014 WL 6390566, at *5.

"By the same token, the government's use of a 'sting' operation — deceptive and controversial as such operations might sometimes be — is not *per se* outrageous." Colon, 2014 WL 6390566, at *5. To the contrary, "'as with all sting operations, government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits.'" Bout, 731 F.3d at 238 (quoting

11

Cromitie, 727 F.3d at 219). "Nor are the federal courts — even when faced with government methods they find unsavory or unwise — at liberty to 'fashion their own sub-constitutional limitations on the conduct of law enforcement agents.'" Colon, 2014 WL 6390566, at *5 (quoting United States v. Ming He, 94 F.3d 782, 792 (2d Cir. 1996)(internal quotation marks and citation omitted).

"The Second Circuit has 'yet to identify a particular set of circumstances in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process.'" United States v. Davis, No. 13CR986 (LTS), 2014 WL 5758199, at *3 (S.D.N.Y. Nov. 5, 2014)(citations omitted). Nor does the Defendant point to any district court in the Circuit which made such a finding. Indeed, aside from considering whether law enforcement coerced or physically violated a defendant's person in order to convince him or her to participate in a crime, courts in the Second Circuit have offered scant guidance on the factors to consider in evaluating a claim of "outrageous government conduct."

Against this legal backdrop, the Defendant essentially urges the Court to adopt the "totality-of-the-circumstances" inquiry employed by the Ninth Circuit. In United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013), that court held that, for purposes of a Fifth Amendment Due Process claim, a court must consider the following factors in assessing the outrageousness of the Government's conduct:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

Id. at 303.

As recognized in Borrero and Gomez, this totality-of-of the circumstances test, applied in Hudson, "has never been adopted in the Second Circuit." Viera, 2015 WL 171848; Borrero, 2014 WL 5493241, at *4 (observing that the government's conduct in stash house sting operation was "not 'outrageous' even under Hudson's analysis" based on the robbery crew's participation in an ongoing criminal enterprise); Gomez, No. 14 Cr. 459(SAS)(S.D.N.Y. Dec. 2, 2014)(noting that the defendant's reliance on Hudson was misplaced because of the Ninth Circuit's totality-of-the-circumstances test, which includes such factors as the government's role in creating the crime of conviction and the government's encouragement of the defendants to commit the offense conduct).

Further, curiously, in the Ninth Circuit, "[t]he burden, at least in reverse-sting cases like this one, is on the Government to establish that its conduct does not surpass due-process limitations." Hudson, 3 F. Supp. 2d at 778 (citing Black). "That is not the standard in this Circuit." Viera, 2015 WL 171848, at *4 (citing Davis, 2014 WL 5758199, at *3).

However, for two alternative reasons, the Court need not resolve the thorny legal questions surrounding an "outrageous government conduct" claim or consider the associated factual disputes, either on the papers or by way of an evidentiary hearing. First, if the Defendant's prior counsel deliberately decided to negotiate a plea offer in lieu of filing an "outrageous government conduct" motion to dismiss Counts One through Three of the Superseding Indictment, such a decision would, for reasons explained later, constitute an "objectively reasonable" tactical choice not subject to judicial second-guessing under the Sixth Amendment. See Gerlaugh v. Stewart, 129 F.3d 1027, 1033 (9th Cir. 1997)("A reasonable tactical choice based on an adequate inquiry is immune from attack under Strickland.")(citing Strickland, 466 U.S. at 689–91). Second, even if the Defendant's former counsel did not

13

deliberately decide to forgo an "outrageous government conduct" motion – perhaps because such a potential basis for dismissal was not apparent to him — any ineffective assistance of counsel was not, in the Court's view, prejudicial to the Defendant.

At this point, the Court briefly reviews the final plea agreement dated September 6, 2013. Under that agreement, the Defendant promised to, among other things, plead guilty to Count One of the Superseding Indictment in contemplation of, among other things, dismissal with prejudice of the remaining counts of the Superseding Indictment. (Def's Exh 6.)  In so agreeing, the Defendant avoided potential conviction on two charges that carried mandatory minimum sentences (Counts 2 and 3) and remained eligible for a three-level Guidelines reduction for acceptance of responsibility, thereby reducing the Defendant's sentencing exposure. Refusing that offer and filing the present motion may have placed the Defendant in a worse position irrespective of whether it was successful. Indeed, the Defendant still would have faced possible conviction on two drug charges (Counts 4 and 5) but would have lost eligibility for the full Guidelines reduction for acceptance of responsibility, thereby enhancing the Defendant's sentencing exposure if convicted.

In other words, even assuming that a motion to dismiss Counts One through Three of the Superseding Indictment would have been successful, the Court cannot fault, in constitutional terms, the Defendant's former counsel for not filing such a motion. See Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 789, 178 L. Ed. 2d 624 (2011)(holding counsel was not constitutionally deficient for failing to consult blood evidence experts because a reasonably competent attorney may have determined that such a strategy would be harmful to the defendant's case).

To be sure, if the Defendant's former counsel did not deliberately decline to file an "outrageous government conduct" motion, it would be difficult to characterize that non-action as a "tactical choice," let alone a "decision" in the traditional sense of those words. However, even if such a motion would have been meritorious and even if not filing such a motion did not constitute an "objectively reasonable" tactical choice, the Defendant's ineffective assistance of counsel claim would fail because he has not established prejudice from any such error.

To prove prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. 2052. In the context of plea negotiations, a defendant can make this showing by producing both a sworn affidavit or testimony stating that he would have rejected a plea agreement but for his counsel's deficient performance and also some additional "objective evidence" supporting his claim. See United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998); see also Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003). This "objective evidence" can be a large disparity between the defendant's advised and actual sentencing exposure. Gordon, 156 F.3d at 381. Even with such a disparity, however, the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible. See Purdy v. United States, 208 F.3d 41, 49 (2d Cir. 2000); see also United States v. Arteca, 411 F.3d 315, 321 (2d Cir. 2005)(explaining that this Circuit "has not adopted mechanistic rules for determining whether an adequate showing of prejudice has been made, but inquires into the record as a whole to determine whether a reasonable probability exists that absent counsel's error, the outcome of the proceeding would have been different").

15

In this case, not only does the Defendant fail to provide a sworn affidavit or testimony stating that he would have rejected the final plea agreement but for his counsel's deficient performance, he fails to point to any "objective evidence" supporting such a claim in the form a disparity between his advised and the actual sentencing disparity. To the contrary, as noted above, the strategy of the Defendant's counsel to pursue the final plea agreement – which would have extinguished each count of the Superseding Indictment save Count One – may have placed the Defendant in a better position in terms of sentencing exposure than had counsel previously brought with success a motion to dismiss Counts One through Three of the Superseding Indictment based on "outrageous government conduct" grounds.

In sum, the Court finds that the Defendant's former counsel did not render constitutionally ineffective representation with regard to not filing an "outrageous government conduct" motion, either because not doing so was an "objectively reasonable" tactical choice or because the Defendant suffered no discernible prejudice as a result.

Having reached this conclusion, the Court need not decide the separate question whether the reverse sting operation giving rise to Counts One through Three of the Superseding Indictment transcended the bounds of Due Process required by the Fifth Amendment to the United States Constitution.

### III.  CONCLUSION

There being no legally cognizable reason, including ineffective assistance of counsel, supporting the Defendant's application to withdraw his guilty plea to Count One of the Superseding Indictment, the Court denies the Defendant's motion (docket no. 121) to do so.  The Court further denies the Defendant's motion to dismiss Counts One through Three of the Superseding Indictment (docket no. 121).

16

**SO ORDERED.**
Dated: Central Islip, New York
February 2, 2015

                                           _*Arthur D. Spatt*_
                                           ARTHUR D. SPATT
                                          United States District Judge